**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN L. GURLEY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 10 C 3304 ) |
| RAY LaHOOD,<br>Secretary of the Department of<br>Transportation, | ) Judge Rebecca R. Pallmeyer ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Gurley, a retired air-traffic control manager, brings suit against the secretary of the Department of Transportation, claiming discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C § 621 *et seq.* Gurley's relationship with his supervisors began to fray prior to his retirement due to his extended periods of sick leave and management dissatisfaction with the medical documentation for those absences. Gurley retired in 2008 at the age of 61. In this lawsuit, he alleges that the Federal Aviation Administration ("FAA"), an agency of the Department of Transportation, discriminated against him on the basis of age when his supervisors required him to exhaust certain types of annual leave that were compensable upon retirement before charging any leave against his "credit hours"—a type of paid leave that is not compensable upon separation. The result was that Gurley, who was capable of working, was required to do so or to use leave hours for which he would otherwise be compensated at the time of his separation from employment. Gurley also alleges that the FAA engaged in age discrimination when it issued a letter reprimanding him for failing to provide adequate medical documentation for his sick leave, and again when it issued a proposed notice of termination (later withdrawn) for the same failure. Defendant moves for summary judgment. For the reasons stated below, the court concludes that Gurley has not suffered adverse action within the meaning of the age discrimination

law and has not shown that age was the reason for any of the action he challenges here. Defendant's motion is granted.

## FACTUAL BACKGROUND

Gurley, born October 17, 1945, worked for the FAA for nearly forty years—from 1970 until his retirement in 2008. (Def.'s Rule 56.1 Statement of Uncontested Facts (hereinafter "Def.'s 56.1"), ¶¶ 1-2.) At the time of his retirement, Gurley's title was "First Line Manager" for the Chicago Air Route Traffic Control Center ("Chicago ARTCC"). (*Id.* ¶ 3.) For safety reasons, the FAA requires certain medical qualifications of employees in Gurley's position. (*Id.* ¶ 4.) In August 2006, Gurley twice visited a doctor complaining of lightheadedness and dizziness, and his doctors later diagnosed him with persistent vertigo. (*Id.* ¶ 5; Gurley Decl., Attach. to Resp. to Def.'s Local Rule 56.1 Statement of Uncontested Facts, ¶ 11.) His condition prompted the FAA's flight surgeon to "decertify" Gurley on August 28, 2006, pending a comprehensive report from Gurley's physician. (Def.'s 56.1 ¶ 6.) From his August 28, 2006 decertification until his retirement in January 2008, Gurley took various extended periods of sick leave. (*Id.* ¶ 7.)

The FAA Human Resources Policy Manual ("HRPM") describes the documentation that an official may request from an employee seeking sick leave approval. Typically, no documentation is required for absences of three days or less. (HRPM, Chapter on Sick Leave for Personal Medical Needs, Ex. F to Def.'s 56.1, ¶ 8.) An employee absent for more than three days "must furnish a medical certificate," unless the employee did not consult a physician, in which case the approving official may accept a written statement from the employee explaining his or her illness. (*Id.*) In any circumstance in which there is doubt concerning the employee's need for sick leave, the approving official may ask the employee to supply "a medical certificate . . . and/or daily information about his/her health condition." (*Id.*) Failure to do so "may result in charge to absence without leave (AWOL)." (*Id.*) When an employee requests leave for a "serious health condition," the approving official must request medical certification from a health care provider detailing (1) the date the

2

condition began; (2) diagnosis and prognosis; (3) whether the employee is incapacitated, and the likely duration of the incapacity; (4) a general statement as to the condition, the examination, and the treatment; (5) a statement that the employee is unable to perform at least one essential job function; and (6) the circumstances surrounding any treatment plan that will result in the employee's need for intermittent or reduced-time leave. (HRPM ¶ 9.)

Sick leave is just one of the categories of leave that air traffic employees accrue; as explained below, the distinction between these categories of leave is at the center of Gurley's age discrimination claim. Sick leave, redeemable as described above, rolls over from year to year, but any unused sick leave is forfeited upon separation from employment. (Dunphy Decl., Ex. E to Def.'s 56.1, ¶ 8.) Annual leave also carries over from one year to the next, but the employee is compensated for any unused annual leave upon separation; Gurley himself received a pre-deduction lump sum of $36,064 for 448 hours of annual leave when he retired in 2008. (*Id.* ¶ 9.) At that time, he also received a lump sum, totaling $88,608.61, for the payout of his restored annual leave—leave hours that were "restored" to Gurley in the wake of the 1981 air trafficker controllers' strike and could be redeemed at any time through 2012. (*Id.* ¶ 10; Gurley Decl. ¶¶ 32, 33.) The final category of leave hours relevant here—"credit hours"—are a "special form" of compensation employees earn when they work more than an eight-hour shift. Employees may take paid leave for the credit hours they have accrued, but any unused credit hours are forfeited upon separation. (Dunphy Decl. ¶ 7; Gurley's Supplemental Statement of Complainant, Department of Transportation Complaint 2007-21304-FAA-04 (hereinafter "Gurley's DOT Complaint Statement"), Ex. B to Def.'s 56.1, at 2-3.) Gurley retired with a balance of 345.75 credit hours. (Dunphy Decl. ¶ 7.)

Over the course of the extended absences that began in August 2006, the FAA sent Gurley a number of letters requesting detailed medical certification of his condition. Flight Surgeon Dr. Marvin Jackson sent the first of these letters on August 28, 2006 (Letter from Jackson to Gurley of 8/28/2006, Ex. G to Def.'s 56.1), but Gurley states that he never received it. (Gurley Decl. ¶ 1.)

3

Gurley did, however, receive the letter Chicago ARTCC Operations Manager Anthony Milligan sent him on October 16, 2006, explaining that the initial physician's notes that Gurley had provided were incomplete and requesting more specific information, pursuant to the HRPM provisions concerning serious medical conditions. (Letter from Milligan to Gurley of 10/16/2006, Ex. G to Def.'s 56.1.) Milligan attached a copy of Department of Labor Form WH-380, a Certification of Healthcare Provider form, and asked that Gurley return it, or a written statement containing the required information, within fifteen days. (*Id.*) Gurley's physician at the time, Dr. Ronald Bosh, responded in a letter dated November 21, 2006, providing a completed WH-380 form. (Completed Form WH-380, Ex. 2 to Gurley Decl; Letter from Bosh to Jackson of 11/21/2006, Ex. 3 to Gurley Decl.) Dr. Bosh explained that Gurley had been diagnosed with "persistent vertigo" but that the cause was still undetermined and the prognosis was unclear. (Letter from Bosh to Jackson of 11/21/2006.) Gurley had undergone a magnetic resonance imaging test ("MRI"), added Dr. Bosh, but was still waiting for further analysis from a neurologist. (*Id.*)

Perhaps because Gurley's local physicians were unable to reach a definitive diagnosis and treatment plan, from December 16, 2006, until March 8, 2007, Gurley received treatment at the Mayo Clinic in Arizona. (Gurley Decl. ¶ 8.) (It is not clear from the record whether Gurley was inpatient at the Mayo Clinic for all or any portion of that time.) While he was in Arizona, the FAA continued to send Gurley letters requesting additional medical information: (1) on February 16, 2007, Milligan sent Gurley a letter advising him that the medical documentation from Dr. Bosh, dated November 21, 2006, was no longer current and that Gurley needed to send recent records, along with a request for leave, to avoid placement on AWOL status; (2) on February 21, 2007, Chicago ARTCC Air Traffic Manager William Cound sent Gurley a memo requesting additional information and threatening disciplinary action if he failed to comply; (3) on March 7, 2007, Milligan sent Gurley a letter stating that the Mayo Clinic records Gurley had sent did not reveal "a clear and specific diagnosis, prognosis, treatment plan, nor any indication that you are unable to perform the

4

essential functions of your position due to your medical condition," and that Gurley still needed to submit an updated leave request; (4) on March 27, 2007, Milligan sent another letter explaining that the records Gurley had sent in response to earlier communications suggested a diagnosis, but that other pertinent information was still lacking. (Letters, Ex. G to Def.'s 56.1.) Gurley claims that he received none of this correspondence while in Arizona. The addresses to which these letters were sent has been redacted, but the court assumes that Milligan sent them to Gurley's home address, rather than to wherever he was staying in Arizona. But even in the light most favorable to Plaintiff, Gurley must have been aware of Milligan's request for additional information, because Milligan's March 7 letter referred specifically to information received from the Mayo Clinic. (*Id.*)

Gurley maintains that he followed all leave procedures. (Pl.'s Rule 56.1 Statement of Additional Undisputed Facts (hereinafter "Pl.'s 56.1"), ¶ 15.) In addition to the WH-380 form and Doctor Bosh's letter, Gurley asserts that he provided the following additional medical documentation, although he does not specify when he provided it: (1) an assessment plan by Doctor Bosh, dated August 2006 (Ex. 4 to Gurley Decl.); a note from Doctor Bosh stating that Gurley was unable to drive, dated September 2006 (Ex. 6 to Gurley Decl.); a prescription for vestibular rehabilitation therapy from the Mayo Clinic dated February 8, 2007 (Ex. 7 to Gurley Decl.); a physical therapy plan of care by a Mayo Clinic occupational therapist, dated February 9, 2007 (Ex. 5 to Gurley Decl.); and a March 11, 2007 note from Doctor Bosh confirming that Gurley "is still being treated for severe vertigo and is still unable to return to work at this time." (Ex. 7 to Gurley Decl.)

At some point—Gurley does not specify when—it appears that Milligan temporarily put Gurley on AWOL status because of his lack of medical documentation. (Pl.'s 56.1 ¶¶ 8, 39.) The AWOL time was converted to paid sick leave once Gurley submitted the appropriate paperwork, although the date this occurred is also unclear. (*Id.* ¶ 9.) Also, during Gurley's period in Arizona, he submitted a request to use 344 credit hours to cover the period from January 8, 2007 to March

5

8, 2007. (Ex. 9 to Gurley Decl.) Milligan denied his request based on "operational necessity." (*Id.*) It may be that relevant policies permitted Defendant to deny a request for use of "credit hours" for reasons of "operational necessity;" neither party has explained this. In any event, Gurrley does not appear to argue that there was no "operational necessity" problem with the approval of his credit hours request. He nevertheless asserts that Milligans decision to deny the request was motivated by discrimination against him as an older person with health problems.

Gurley returned to work on April 9, 2007, in a "limited capacity," per his doctor's request. (Letter from Milligan to Gurley of 3/25/2007 (hereinafter "Clarification Letter"), Ex. G to Def.'s 56.1.) Gurley was unable to resume his full-time position because he was undergoing rehabilitative therapy two to three days per week. (Gurley Decl. ¶ 14.) Even after Gurley returned to work part-time, the FAA continued to request additional medical documentation. In particular, on April 25, 2007, Gurley received several communications from Milligan. First, Milligan sent him a letter seeking clarification of what Gurley's "limited capacity" entailed and requesting a statement explaining what specific duties Gurley was unable to perform. (Clarification Letter.)

Second, in a separate document, Milligan provided Gurley with written notice that he had been "officially reprimanded for failure to follow leave procedures." (Letter from Milligan to Gurley of 3/25/2007 (hereinafter "Reprimand Letter"), Ex. I to Def.'s 56.1, at 1.) Milligan cited Gurley's failure to provide "administratively acceptable evidence" of his condition, and stated that he had breached his duties as a supervisor to comply with all FAA policies and to set a good example for his subordinates. (*Id.* at 1.) Future breaches of policy could result in removal from service, Milligan warned. (*Id.* at 2.)

In a third document, Milligan memorialized new restrictions on Gurley's use of leave time and credit hours deemed necessary based on Gurley's failure to follow leave procedures. (Memorandum from Milligan to Gurley of 3/25/2007 (hereinafter "Leave Time Memo"), Ex. M to Def.'s 56.1.) One of the new restrictions required Gurley to use all of his "use or lose" annual leave

6

and restored annual leave prior to using any credit hours. (Leave Time Memo at 1.)[1] Gurley has submitted statements from several fellow Chicago ARTCC managers, compiled during the course of a DOT investigation, to demonstrate that other employees were not required to use annual leave before their credit hours. (Exs. 2-4 to Pl.'s 56.1.) Moreover, Milligan admits that he did not impose this restriction on any other employee; instead, he explained that Gurley's situation was unique; he stated that no one "older or younger" than Gurley was in Gurley's "situation." (Excerpt from Milligan Dep., Ex. 6 to Pl.'s 56.1, at 75:3-14.)[2]

Gurley argues that Milligan's intention behind prescribing these new policies was to force Gurley to forfeit the credit hours he had earned. Gurley explains that, when he received the memo advising him of the new restrictions, 1376 hours of regular duty remained in the year. (Gurley's DOT Complaint Statement at 2.) At that time, he had 1511 hours of annual leave (448 hours of annual leave and 1063 hours of restored leave) and 345.75 credit hours. (Def.'s 56.1 ¶ 60.) And Milligan was aware of Gurley's plans to retire on January 3, 2008. (*Id.*) In other words, Milligan knew that it would be impossible for Gurley to exhaust his annual leave before retirement; because the credit hours are not paid out upon separation, Gurley alleges, "Milligan's directive had the

---

[1] The distinction between "use or lose" annual leave and other annual leave is not clear from the record. The court notes from its own research that the U.S. Office of Personnel Management describes "use or lose" annual leave as "the amount of accrued annual leave that is in excess of the employee's maximum annual leave limitation for carry over into the next leave year. Employees must 'use' their excess annual leave by the end of a leave year or they will 'lose' (forfeit) it." *Leave Year Beginning and Ending Dates*, U.S. OFFICE OF PERSONNEL MANAGEMENT, http://www.opm.gov/oca/leave/html/Leaveyeardates.asp (last visited March 30, 2012). Although "use or lose" annual leave appears to expire after a year, the court assumes that it is payable upon separation just like all accumulated annual leave. The court adopts this assumption because otherwise, it is unclear why Gurley would object to a policy requiring use of "use or lose" annual leave before credit hours; for an employee who plans on retiring within the year, exhausting leave that is not payable upon separation, like the FAA's credit hours, would maximize the amount of leave to be paid out at retirement.

[2] Because Plaintiff only provided a single page of this transcript, it is unclear what "situation" Milligan was referring to. The court assumes that Milligan was referring to Gurley's extended periods of sick leave accompanied by inadequate medical documentation.

7

known, unavoidable consequence of a loss of all my credit hours." (*Id.*) In support of his belief, Gurley provides an Affidavit from Andrew Houzenga, a fellow front line manager at the Chicago ARTCC, who stated that Mulligan told him he hoped Gurley "would give up fighting it and retire." (Houzenga Aff., Ex. 3 to Pl.'s 56.1, at 2.) Houzenga, who was in charge of scheduling for fellow supervisors, acknowledged, however, that "John [Gurley]'s frequent absences were creating a lot of work and changes in the schedule." (*Id.* at 1-2.) Indeed, Gurley acknowledged in his deposition that Milligan wanted Gurley to retire because Milligan no longer wanted to deal with Gurley's health problems. (Gurley Dep., Ex. A to Def.'s 56.1, at 36:1-12.) Gurley appears to believe this concern itself is unlawful; when asked why he believed he was subject to discrimination based on age, Gurley explained, "as you get older, you start having health issues." (*Id.*)

The following month, Gurley and Milligan had another altercation involving leave hours. Gurley sustained a burn to his hand on May 7, 2007. (Gurley Decl. ¶ 46.) The record does not reveal how Gurley burned his hand, or whether the injury occurred at work. Because the new leave policies that applied only to Gurley required prior approval of any leave, Gurley had to await Milligan's arrival at the office in order to request sick leave to seek medical attention for his hand. (*Id.* ¶ 47.) Gurley states that he requested four hours of sick leave, but that Milligan granted him only two hours. (*Id.* ¶ 48.) Gurley knew he could not get urgent care treatment and return to work in two hours, so he waited until there were only two hours left in his shift before going to the urgent care clinic. (*Id.* ¶¶ 49, 52.) Gurley alleges that Milligan intentionally placed him in a position where he would be subject to disciplinary action if, in tending to his wound, he was absent for more than two hours. (*Id.* ¶ 51.) Defendant does not explicitly defend Milligan's conduct; it simply explains that, when questioned by Milligan, Gurley stated that he could complete his daily work assignments if he took two hours sick leave, but not if he took four hours. (Def.'s 56.1 ¶ 38.) Thus, Milligan granted only two hours sick leave. (*Id.* ¶ 39.) It is not clear whether it is Defendant's contention that

8

Milligan told Gurley he could leave so long as he was able to finish his work or whether Defendant suggests that the decision to take just two hours of leave was Gurley's own.

Thereafter, Gurley's relationship with his employer deteriorated further. On June 25, 2007, Dr. Jackson, the FAA doctor, requested a current report from Gurley's rehabilitation program by July 25, 2007. (Letter from Jackson to Gurley of 6/25/2007, Ex. G to Def.'s 56.1.) On July 2, 2007, Gurley filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging age discrimination. (Def.'s 56.1 ¶ 41.) On July 5, 2007, Gurley received another letter from Cound requesting medical information. (Letter from Cound to Gurley of 7/5/2007, Ex. G to Def.'s 56.1.) The next week, Milligan sent Gurley yet another letter seeking documentation to help determine whether Gurley would soon be able to resume his full-time work. (Letter from Milligan to Gurley of 7/9/2007, Ex. G to Def.'s 56.1.) Milligan warned that if Gurley did not provide "medical evidence on this issue that is acceptable to the Aerospace Medicine Division by August 14, 2007," his employment could be terminated. (*Id.*) Evidently Gurley did not supply satisfactory information; Defendant issued a "proposed termination notice" on September 10, 2007, stating that Gurley's "[u]navailability for regular full time duty" precipitated his termination. (Letter from Cound to Gurley of 9/10/2007 (hereinafter "Termination Notice"), Ex. R to Def.'s 56.1.) The letter granted him fifteen days to reply.

At roughly the same time that Gurley's ongoing difficulties with FAA management were coming to a head, Gurley was making a complete recovery from his persistent vertigo. In response to the Termination Notice, Gurley sent Cound a letter explaining that his vertigo had "cleared up" in July, that he had passed an FAA-administered health exam on August 6, 2007, and that the flight surgeon was simply waiting for results from one more test (scheduled for September 27, 2007) before clearing Gurley for regular duty. (Letter from Gurley to Cound of 9/24/2007, Ex. S. to Def.'s 56.1.) Indeed, on October 10, 2007, Dr. Jackson issued Gurley's medical clearance. (ATC Medical Clearance, Ex. T to Def.'s 56.1.) Gurley sent Cound a follow-up letter requesting immediate

withdrawal of the Termination notice (Letter from Gurley to Cound of 10/15/2007, Ex. 11 to Gurley's Decl.), and three weeks later, Cound complied. (Letter from Cound to Gurley of 11/5/2007, Ex. U to Def.'s 56.1.) Gurley resumed his full-time employment until his retirement on January 3, 2008. (Def.'s 56.1 ¶ 56.) Gurley was not charged for any of his annual or restored annual leave for his absences during 2007 (Dunphy Decl. ¶ 5), and upon his retirement, he received a net lump sum payment of $25,443.15 for 448 hours of annual leave and $62,513.37 for 1,063 hours of restored annual leave. (Def.'s 56.1 ¶¶ 60-62.)

Though relations between Gurley and his supervisors eased in the last days of Gurley's employment, he continued to pursue his age discrimination claims. In his initial EEOC complaint, Gurley alleged that the FAA engaged in age discrimination (1) when Milligan issued Gurley the Leave Time Memo, refusing to allow Gurley to use his credit hours; (2) when Milligan issued Gurley the Reprimand Letter; and (3) when Milligan denied Gurley's request for four hours of sick leave so that Gurley could seek urgent care for his burned hand. He filed a second complaint with the EEOC on November 26, 2007, alleging that his proposed termination was in retaliation for his first EEO complaint. (Nov. 26, 2007 DOT Complaint, Ex. Q to Def.'s 56.1.) On July 20, 2009, an administrative law judge ("ALJ") issued a order in favor of the FAA without a hearing, which the FAA adopted. Gurley appealed to the EEOC, which vacated the order, explaining that the ALJ erred in ruling without a hearing. (EEOC Decision, Ex. A to Compl, at 4.) The EEOC granted Gurley the right to file a civil action in federal court rather than continue the administrative proceedings (*id.* at 5), and this lawsuit followed.

In this lawsuit, Plaintiff alleges that Defendant discriminated on the basis of his age when (1) he was not allowed to use 344 hours of credit hours leave; (2) Milligan issued the Leave Time Memo, directing Gurley not to use earned credit hours; and (3) Milligan issued him a written reprimand for not providing requested leave documents. In his Second Amended Complaint, Plaintiff also asserted a retaliation claim, alleging that the Termination Notice of September 10,

2007, was in retaliation for his EEO claim. The court dismissed this retaliation count as time barred, but provided that the "termination notice will be admissible as evidence of damages flowing from the alleged age discrimination." (Jan. 10, 2011 Minute Order [25].) Consequently, the court considers the Termination Notice as a fourth instance of discrimination below.

## **DISCUSSION**

The court shall grant a motion for summary judgment if the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court examines the record in the light most favorable to, and draws all reasonable inferences in favor of Gurley, the non-moving party. *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 498 (7th Cir. 2009); *Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 523 (7th Cir. 2008). The Seventh Circuit has observed that "summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1111 (7th Cir. 2004) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)).

Under the ADEA, employers may not discriminate against an employee on the basis of age. 29 U.S.C. § 623(a)(1); *Mach*, 580 F.3d at 498. To prove discrimination in violation of the ADEA, a plaintiff must prove "that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 2352 (2009); *Barton v. Zimmer*, 662 F.3d 448, 455 (7th Cir. 2011). To avoid summary judgment, Gurley may establish his ADEA claim by either the direct or indirect method of proof. *Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010). Under either method, Plaintiff must establish that he was subject to an adverse employment action. *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 849 (7th Cir. 2008) ("The direct method requires the plaintiff to produce evidence that the defendants were motivated by animus based upon his national origin when he was denied some employment benefit or suffered some adverse employment action."); *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627

11

F.3d 596, 599-600 (7th Cir. 2010) (explaining that under the indirect method, a plaintiff "must show that (1) he is a member of the protected class; (2) he was performing well enough to meet his employer's legitimate expectations; (3) *he suffered an adverse employment action*; and (4) similarly situated employees not in his protected class were treated more favorably" (emphasis added)).

Adverse employment actions "must be materially adverse, not merely an inconvenience or a change in job responsibilities" and must "significantly alter[ ] the terms and conditions of the employee's job." *Griffin*, 356 F.3d at 829. As the Seventh Circuit has observed:

> Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge.

*Barton*, 662 F.3d at 453-54.

The September 27, 2011 Termination Notice does not constitute an adverse employment action. Although termination is the very definition of an adverse employment action, as noted in the first category mentioned above, Plaintiff does not appear to have suffered any harm resulting from the notice, which the FAA withdrew when Plaintiff provided the appropriate medical documentation and when Jackson cleared him to resume full-time work. Plaintiff does not allege that he was still too ill to come to work or that he was forced back into full-time employment against his will. Nor is there any basis to conclude that the Termination Notice forced Gurley to retire earlier than he had planned. In his EEO Complaint, Gurley alleged that Milligan was aware as of the time of the Leave Work Memo that Gurley planned on retiring on January 3, 2008. (DOT Complaint Statement, at 2.) Gurley did in fact retire as planned on January 3, 2008.[3]

---

[3] In his brief in opposition to summary judgment, Plaintiff Plaintiff does not allude to any claim arising out of the burned hand incident on May 7, 2007, and any claim arising out of the incident appears to be waived. In any event, the court does not believe that a reasonable trier of fact could find that Milligan's denial of Gurley's request for four hours, rather than two hours, of sick
(continued...)

Gurley's claim that the Reprimand Letter constituted an adverse employment action is also unpersuasive. The Seventh Circuit has explained that "written reprimands without any changes in the terms or conditions of . . . employment are not adverse employment actions." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009). Furthermore, the reprimand concerned Gurley's allegedly inadequate medical disclosures, and the FAA does not alter the terms and conditions of employment where it simply requires that an employee follow agency-wide procedures. *See Thomas-Bagrowski v. LaHood*, 361 F. App'x 694, 698 (7th Cir. 2010) (concluding that "the FAA did not take a materially adverse action by declining to approve [the plaintiff's] requests for sick leave or to telecommute" where the plaintiff "refuse[d] to provide required documentation"). Whether or not Defendant is correct that Gurley failed to follow leave procedures, the written reprimand does not rise to the level of an adverse employment action on its own.

The reprimand was accompanied, however, by the Leave Time Memo, which barred Gurley from using earned credit hours until he had exhausted "use or lose" annual leave and restored annual leave. Such a policy appears to fit within the first category of adverse employment actions mentioned above—a reduction in compensation, fringe benefits, or other financial terms of employment. Establishing an adverse employment action would be easier for Plaintiff if he had been forced to use his restored annual leave or other annual leave that is payable upon retirement. But Plaintiff does not appear to have used any annual leave in 2007, and is therefore unable to claim that he was deprived of any financial benefit upon retirement. Thus, the most that Plaintiff

---

[3](...continued)
leave is sufficient to support a claim on its own. Under some circumstances, an employer's refusal to grant sick leave in order for an employee to address medical needs may constitute harassment, depending on the severity of the medical need or the frequency of such refusals. Perhaps because Gurley has not pursued the matter, Defendant does not appear to defend Milligan's decision explicitly, but the record provides little detail concernng the nature or extent of Gurley's injury. Absent such evidence, and absent any effective briefing, the court concludes Gurley has not shown that Milligan's decision to grant just two hours of sick leave on this single occasion establishes a a hostile work environment.

alleges is that by barring him from using credit hours, the FAA prevented Gurley from sitting out the remainder of his time before retirement by using paid leave that was not compensable upon retirement. As a result, Gurley decided to return to work in order to preserve the accrued leave that would translate into additional compensation upon retirement.

Moreover, even if this court were to rule in favor of Plaintiff, he cannot establish any compensatory damages. The 345.75 credit hours that Gurley claims he was unable to use had no financial value upon his retirement. Nor has Gurley suggested that the FAA exacerbated his illness by forcing him to return to work. The court concludes that requiring an employee to use one type of leave over another is not an adverse employment action where the only apparent harm the employee suffers results from his decision to show up for work.

Because the court concludes that Plaintiff has failed to establish an adverse employment action, the court need not address the other elements under either the direct or indirect methods of proof. The court notes, however, that Milligan's single reference to Gurley's scheduled retirement (a comment he made to Houzenga) appears to be insufficient to satisfy the direct method. *Cf. Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 268 (7th Cir. 1997) (observing that "*repeated* references to retirement may permit a jury to infer discrimination to rid itself of older workers by subtly pressuring them into retiring" (emphasis added)).

Finally, even if the court were to conclude that Plaintiff satisfied all the elements of a *prima facie* case of age discrimination under the indirect method of proof, Plaintiff has not met his burden of demonstrating that Defendant's purported non-discriminatory reasons for the Leave Time Memo are pretextual. Defendant asserts that the FAA issued Gurley the credit-hour directive because of the way he had managed his extended leaves in the past and Defendant "wanted to be [a] good steward[ ] of public funds." (Def.'s Mem. in Supp. of Summ. J. at 10-11.) Defendant characterizes its directive as a response to "Gurley's transparent scheme to be paid even more for *not* working." (Def.'s Reply in Supp. of His Mot. for Summ. J. at 11.) Plaintiff makes no attempt to explain how

Defendant's proffered explanation is pretextual. In his response brief, Plaintiff does little more than present the relevant legal standards followed by the statement, "[I]t is submitted, based on the facts presented here, there is more than enough evidence for a reasonable fact finder to conclude that some kind of age discrimination occurred." (Pl.'s Brief at 11-12.) Such a conclusory statement is not sufficient to overcome summary judgment.

Moreover, Plaintiff's effort to conflate his illness with age is unavailing. Even if his health issues were related to his age, FAA action against Plaintiff because of his health issues is not age discrimination. It is not sufficient for age to be a "motivating factor"; it must be the "but for" cause of the adverse employment action. See *Gross*, 129 S. Ct. at 2352.

## **CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment [29] is granted.

ENTER:

Dated: April 3, 2012

_____
REBECCA R. PALLMEYER
United States District Judge